Henry W. Lengyel, J.
This is a claim for the appropriation of claimants ’ land pursuant to section 30 of the Highway Law, which proceeding is described as Liberty-County Line, Part 2, S. H. No. 5234, Sullivan County, Map No. 173 Parcels Nos. 297 and 298. The aforesaid map and descriptions were filed in the office of the Secretary of State on the 14th day of July, 1964; and in the office of the County Clerk of Sullivan County on the 7th day of August, 1964. The claim was filed with the Clerk of the Court of Claims and the Attorney-General on the 14th day of October, 1964 and has not been assigned or submitted to any other court or tribunal for audit or determination. The court adopts the descriptions of the appropriated property as shown on the map and descriptions filed in the Sullivan County Clerk’s office, a copy of which is attached to the claim and same is incorporated herein by reference. Claimants reputedly were the owners of the property described herein, a portion of which was appropriated by the State of New York.
*450 Subject property was located in the Village of Boscoe, Town of Bockland, New York, near the eastern boundary of said village. It fronted on both the north and south sides of Boute 17. A 10.2± acre parcel with 310± feet of frontage was located on the north side of Boute 17. Opposite this parcel was a 1.43± acre parcel with 352± feet of frontage along the south boundary of said highway.
The property north of Boute 17 was improved with the Boscoe Diner. Both appraisers agreed that this parcel had not been directly damaged or otherwise affected by the appropriation. We have allocated a nominal $1 before and after value to said northern parcel.
The 1.43± acre parcel south of Boute 17 was generally level with the grade of said highway. This parcel had 352± feet frontage on Boute 17 and 120± feet frontage on Cottage Street, a blacktopped village street which ran south from Boute 17. The south property line measured 353.20± feet and the west property line measured 214 ± feet.
The State’s appraiser divided the property into two parcels, i.e., a leased gas station parcel and the remaining land which contained a fuel oil business and a residence. The claimants’ appraiser divided the property into three parcels, i.e., the leased gas station parcel; the area of frontage west of the gas station parcel to a depth of 100± feet; and, the back area which contained the fuel oil business and a small cabin. After viewing the property and reviewing the evidence, we find ourselves in agreement with the claimants’ appraiser in respect to his physical division of the property but not as to his measurements.
The northeast parcel contained 0.45 ± acre of land and was leased to Humble Oil and Befining Company. This parcel contained 200± feet of the Boute 17 frontage and 100± feet of the frontage along Cottage Street. It was a generally rectangular parcel. Claimants’ appraiser considered that said leased parcel contained 0.332± acre with 183± feet frontage on Boute 17 and 79± feet frontage on Cottage Street. Prom claimants’ appraisal it is obvious that said appraiser considered that the 200± feet frontage on Boute 17 and the 100± feet frontage on Cottage Street set forth in the lease were measured from the centerlines of said streets. He, therefore, deducted the distance from the center of the streets to the street boundaries and arrived at the above frontage figures. The lease did establish the measurements from the center of said streets. However, if we use the center of Boute 17 as the starting point for the west boundary line of 100± feet, we find that the rear boundary line of the leased property would run through the service station building *451 leaving about one third of said building outside the boundaries of the leased parcel. Such situation is obvious when one examines the appropriation map and the scaled sketches of the leased property contained in the two appraisals which were received in evidence. We, therefore, find that the dimensions of the leased property were as set forth by the State’s appraiser. This site was improved with a two-story wood frame building. The ground floor contained a three-stall service garage with a built-in grease pit. Also located on the ground floor were a small office, snack bar and two lavatories. The second floor contained a four-room apartment with bath. The site was enhanced by blacktop and a gas pump island. It was serviced by electricity and municipal sewer and water. The lease was negotiated on February 1, 1961 and terminated on September 14, 1965. The rental was $150 per month plus $0.01 per gallon for each gallon pumped over 125,000 gallons annually. We consider this lease, which was negotiated about 3.5 years prior to the appropriation, to be excellent indicia of the fair market value of this parcel prior to the appropriation. The highest and best use of this parcel both before and after the appropriation was as a gas service station with an apartment.
Immediately west of the gas station parcel was the parcel which contained the residence occupied by claimants’ son. This parcel had 152± feet frontage on the south side of Route 17 and a depth of 100± feet. It contained 0.348± acre. Located at the easterly end of the parcel, approximately 16± feet westerly of the service station parcel’s west boundary line and almost centered in the depth of said parcel, was a one-story wood frame residence with a gable roof. It was on a cinder block foundation and did not contain a basement. It did contain a living room, kitchen with dining area, one bedroom and full bath. It was heated with an oil-fired hot air furnace. At the date of the appropriation a house trailer was located just west of the residence. The claimants’ appraiser valued this property as commercially developable land both before and after the appropriation. In his opinion the residence would not have to be removed for such use to be made of the property. He thought the appropriation consequently damaged this land by 20% but did not damage the residence. As he did not consequentially damage the residence, we must assume his consequential damage of 20% was solely related to his commercial theory. In our opinion, the area was too small to be used both commercially and for a residence. The State’s appraiser considered this parcel and the backland as one parcel and allocated a highest and best use before the appropriation as commercial and residential. He consequen *452 tially damaged the residence building by 5%. As stated previously we separated this parcel from the backland which contained the fuel oil business. We find that the highest and best use of this parcel both before and after the appropriation was residential. We find a consequential damage of 5% to both the remaining land and the building in the residential parcel.
The third parcel was a commercially developed parcel' of 0.632± acre at the rear of the above-described parcels. This parcel had 20± feet frontage on Cottage Street and extended 353.20± feet to the west boundary line where it had a width of 114± feet. The claimants operated a fuel oil business on this section of their property, which was its highest and best use prior to the appropriation. The remaining land after the appropriation, 0.0934± acre, had a nominal highest and best use as an addition to the leased parcel. The improvements used in the fuel oil business were generally affixed to the real estate in a line along the south or rear boundary line. There were two small one-story wood frame structures with shed roofs of rolled composition material used for storage purposes. There was a one-story wood frame building with a gable roof. It had a stone foundation and asphalt siding. It contained a kitchen, living room, bedroom and bath. The living room had a rough cobblestone fireplace. This cabin-type building was located about 6± feet west of a 2,000-gallon Diesel fuel tank and about 10± feet east of another 2,000-gallon Diesel fuel tank. The fuel oil business was divided into three different systems, i.e., fuel oil, Diesel fuel, and kerosene. The kerosene system was a 7,500-gallon tank which was raised about 10 feet off the ground by reinforced concrete and steel supports which were sunk about 5 feet below ground level to allow for frost. There was an electric bulk pump on a concrete base and a steel ladder to the top of the tank. There were the required tank loading and unloading facilities, fuel handling valves, gate valves, check valves, fittings, pipes, and electrical service to permit an efficient operation of this system. West of the kerosene system and on either side of the aforesaid cabin were two 2,000-gallon Diesel fuel tanks which were supported on reinforced concrete and steel supports. Both of these tanks were connected by an underground pipeline system which is described in Exhibit “ 21 ”, a schematic drawing of the three different fuel systems which constituted the Bullís Fuel Oil Company. The Diesel fuel system had the required pumps, gates, valves, wiring, etc. for an efficient operation. Next in line and west of the Diesel fuel tanks were the five tanks which constituted the fuel oil system. There were a 12,000-gallon tank, two 10,000-gallon tanks and two 5,000-gallon *453 tanks in this system. They were connected by underground loading lines so that all tanks could be loaded from one central point. The three larger tanks were about 10 feet off the ground on steel and reinforced concrete supports. The two smaller tanks were at ground level on reinforced concrete cradles. This system also contained the required pumps, etc., for an efficient operation. The fuel business parcel was improved with graveled driveways and parking areas sufficient to support the heavy truck traffic incidental to said business. The graveled drives were composed of three to four feet of gravel fill with three to four inches of crushed rock as top dressing. The claimants bought the land in about 1935 and started the fuel oil business in 1951. They were actively engaged in the fuel oil business at the date of the appropriation. There is absolutely no question that they not only intended to make this a permanent installation but had done so until disrupted by the appropriation which directly took most of the land and all of the improvements set forth above.
Claimants left the bulk tank plant intact after the appropriation and all of said equipment was taken by the appropriation. At the trial it was the State’s position that these items were personal property and should have been moved by the claimants ; and, that as the claimants had voluntarily not moved their equipment, they should not be compensated for the loss of same in this proceeding. There is no question but that the bulk tanks could have been moved, although with some difficulty and the possibility of damage in transit. In fact in this day and age there are probably very few items which cannot be moved by modern moving techniques. We do not consider the mere fact of movability as the critical difference between a fixture and an item of personalty. We consider the intent of the claimants to be of primary import and in the subject claim the intent was clearly one of a permanent and fixed installation. We consider the degree of fixation to the realty to be of prime importance and in subject claim there was a high degree of fixation and adaptability of the bulk tank operation to the land. We also took cognizance of the fact that it is dangerous to move tanks which have stored highly flammable and explosive materials. We find that the aforesaid items were part of the realty appropriated by the State and for which the State must pay compensation. As was stated in Jackson v. State of New York (213 N. Y. 34, 35), “ It is intolerable that the State, after condemning a factory or warehouse, should surrender to the owner a stock of second-hand machinery and in so doing discharge the full measure of its duty.” (See, also, Marraro v. State of New *454 York, 12 N Y 2d 285, 291; Matter of City of New York [Whitlock Ave.], 278 N. Y. 276; Cooney Bros. v. State of New York, 47 Misc 2d 641; County Asphalt v. State of New York, Claim No. 44138.)
The State’s appraiser did not assign any value to the bulk fuel equipment described above, except for two concrete saddles. He stated at page 14 of part II of his appraisal that ‘ Items of personal property have not been included as part of this report. Those items which are specifically excluded consist of fuel storage tanks and pipe. Reference should be made to the addendum of this report for an estimate of the value of these items.” We examined said addendum but did not locate any reference to said values. However, during a recess in the trial of this claim, the State’s appraiser telephoned a contractor at Newburgh, New York, and gave him a general description of the bulk tank equipment. Based on this description he was given a figure of $23,000 as the value of said equipment. The gentleman at Newburgh had never seen this equipment in place and there were many items of equipment which were omitted from the general description provided by the State’s appraiser. We have not given this evaluation of the bulk tank equipment any credence. (See Bell v. State of New York, 24 A D 2d 663; County Asphalt v. State of New York, Claim No. 44138.)
The claimants produced an expert witness, Lewis E. Furbeck, who was a contractor in the business of installing and servicing fuel-oil tanks. He had been in this business for 15 years and made a complete examination of the claimants’ bulk tank fuel operation. It was his opinion that the bulk tanks and related equipment were in good condition and that the loading and unloading systems were satisfactory and adequate to the needs of the operation. He pointed out that with proper maintenance the tanks would last for 200 years and that there was very little depreciation involved in properly maintained bulk fuel tanks. He depreciated the kerosene system by 8% and the two fuel systems by 6%, apparently not because he thought they had actually been depreciated by use but because it was custom to have some depreciation. His depreciated value of $57,556 was the only valuation presented to the court with probative weight. It was developed on cross-examination that he considered all of these items as being initially installed as new equipment. Actually two of the tanks were purchased secondhand by the claimants and at a much lesser price than used by this expert; e.g., the 7,500-gallon kerosene tank was purchased for $1,200 to $1,500, whereas this expert considered it initially as a $5,000 item. As we do not believe the State should pay new prices for *455 second-hand installations, we have reduced this witness’ depreciated valuation just prior to the appropriation to $51,045.
Subject proceeding appropriated 0.601± acre of claimants’ property in fee without right of access.
Parcel 297 consisted of 0.599± acre which extended across the entire rear land portion of claimants’ property and which affected each of the three portions of said property.
A triangular portion of this parcel with 55 ± feet of frontage along Cottage Street and containing 0.284± acre was taken from the leased service station parcel. Because of the angle taken east of the garage building, it will make it necessary for the claimants to reconstruct the three bays in the garage building. This, together with a loss in area, has caused a consequential damage to the remaining leased service station property.
At the northwest area of Parcel 297 a triangular portion of ,032± acre was taken from the residential portion of said property. Also Parcel 298 took a small rectangular parcel of 0.002± acre from the northwest corner of the residential portion. The proximity of the new highway and the change in grade has consequentially damaged the residential building and remaining land by 5%.
The remaining portion of Parcel 297 was 0.5386 =t acre which contained almost all of the bulk tank business area. The remaining 0.0934± acre is in proximity to the leased gas station area. We reduced the value of this parcel to the after value of the gas station area.
The following table sets forth our before and after values and damages:
Description Before After Damage
Leased Gas Station.............. $14,000.00 $11,600.00 $400.00 D. D.
2,000.00 C. D.
Residential..................... 9,100.00 8,550.00 100.00 D. D.
450.00 C. D.
Bulk Tank Area................ 58,045.00 450.00 57,345.00 D. D.
250.00 C. D.
North of Route 17.............. 1.00 1.00 -0-
$81,146.00 $20,601.00 $60,545.00
The court finds that the fair and reasonable market value of the subject property before the taking was $81,146; that the fair and reasonable market value of the subject property after the taking was $20,601; and, that the amount by which the claimants have been damaged is $60,545; of this amount $57,845 repre *456 sents direct damage and $2,700 represents consequential damage to the remainder. The claimants are entitled to an award therefor together with appropriate interest.
The court has viewed the property.
The claimants are awarded the sum of $60,545 for all damages direct and consequential, with interest thereon from August 7, 1964 to the date of entry of judgment herein.